May it please the court. Good morning, my name is Anna Marie Frank and I'm here with Victoria Diaz. We are law students at the University of Arizona. We're here on behalf of Mr. Lee Jin Song, the appellant in this case. Also present today is Dr. Willie Jordan Curtis and she's our supervising attorney today. Okay, now I want to assure everyone that this has no bearing on how I will decide the case, but I would like to acknowledge the fact that Dr. Jordan Curtis was my student many years ago and I'm very glad to see her here. With the court's permission we'd like to reserve two minutes for rebuttal. Okay. I will be addressing the background information relating to Mr. Song's asylum claim and co-counsel Victoria Diaz will be speaking specifically on issues of credibility. Okay. Okay. And do you want to, are you going to do four minutes, four minutes? That's how I would like to do it, yes. Thank you so much. Mr. Song is before this court appealing the immigration judge's adverse credibility findings, which led to the denial of his asylum application. And he is appealing it for three basic reasons and the first is that, and these reasons my co-counsel will further discuss in her argument, but the three reasons are that the immigration judge improperly relied on the two airport interviews. The second reason is because any statements made after the initial airport interviews were not inconsistent and any alleged confusion should have, the immigration judge could have resolved by further inquiry. And the third reason is because the judge placed too much weight on the absence of Mr. Song's sister during the hearing. Okay. This is a case about a man struggling to be heard. In the rise of the Tandem Square Massacre, Mr. Song attempted to have his voice be heard by participating in a student movement demonstration in his hometown. Now, the officials silenced him by arresting him, jailing him, bashing him over the head with a wooden club until he was left with a bloody gash. And Mr. Song had to receive 20 stitches to fix, to stitch up his gash and he still has a scar to this day in pains from this brutality that he faced. Did he demonstrate the scars physically at the hearing? He did tell the immigration judge that he had a scar on his head. I don't believe that it was considered part of the, taken into consideration with regard to corroborating evidence. But does he go like this, you know, you see my scar? I'm not, I, I read the transcript and I didn't see it there, but I might have missed it. I believe you are correct, Your Honor. I'm not exactly certain where the scar is on his head. I know that he did make reference to it, but I'm not exactly certain. And I think that you are correct in asserting that he did not demonstrate it in that manner. Besides being beaten over the head, he was also in this first incident forced to sign a statement stating that he would no longer partake in political activities. And he was barred from taking the college entrance exams for three years after graduating from high school. And that's the first incident. The second time that Mr. Song attempted to be heard, he was again arrested, jailed, this time chained to a bench for three days while officers at one time kicked him, threw food scraps at him and took turns interrogating him. And shortly after this incident, Mr. Song is, that's when he came to the United States. But an important thing to remember is that Mr. Song also comes from a family of political dissidents. His father was condemned by the Chinese government for speaking out against communism, as well as his brother, who was one of the founders of the Chinese Democratic Party. And he was in prison for several years for his involvement. Mr. Song came to the United States in 1999. And he arrived in LAX after a long flight in which he was harassed by co-workers and his documents and passports were taken from him by the co-workers. And when he arrived here in the United States, he was questioned by the Immigration and Naturalization Service. And there are only two interviews on record pertaining to the interviews, and one of which, the record is unclear, was taken in Mandarin. And Mr. Song, as he testified in the hearings, he was concerned when testifying to, with the use of the Mandarin interpreter, that the interpreter could have been an agent of the government from which he was flamed. Yes, although I have to say, I was confused by those two airport interviews. They actually seem pretty consistent. And so he says, I was afraid to answer truthfully or at length with respect to the person who spoke Chinese, because I was afraid he was from the embassy. But he didn't say anything very different to the other one. I would have to agree with you, Your Honor, on that one. And that's part of, that's been part of our argument is that there is, seems to be a third interview that's not on record. And this is implied both in statements made by officers on page four of each interview, where the officers make very similar statements saying, you are, I need to remind you, you're under oath, you're telling me a different story than last time. And you need to tell me the true story. And now that was a statement that it appears the immigration judge based her order on. She stated that she had the impression that he was being untruthful to officers. And she said it related to a nonpolitical statement. So she based an adverse credibility finding on the findings of the immigration officials based on this one statement, even though the immigration officials later found that he met the low threshold of credibility so that he can go to the removal hearings. Okay. Now, in order to save enough time for your co-counsel, I think we'd better let you sit down at this point. Great. Thank you very much. Good morning, Your Honors. My name is Victoria Diaz. And I would like to begin this morning by stating that this court has held that an immigration judge must articulate a legitimate basis for an adverse credibility finding and must point to specific and were not cogent because they were not relevant, compelling, nor did they have any bearing on Mr. Song's asylum claim. Because this case was filed prior to the May 11, 2005, enactment of the REAL-ID Act, any inconsistencies alleged by an immigration judge must go to the heart of the claim. And this bears the question, well, what is the heart of Mr. Song's claim? And what is the basis of his fear of persecution? Mr. Song is a strong believer in democracy. And on two separate occasions, he was arrested, detained, interrogated, beaten with a wooden club. He was beaten to a ---- He wasn't beaten with a wooden club on both occasions. No, not on both occasions. He was arrested on two occasions and detained. And he was forced to censor his core political beliefs. The acts committed by the Chinese government officials amounts to persecution on account of his political opinion. What do we do? There are two episodes. One's in 1989. Correct. That's when he's demonstrating in front of the town hall along with a lot of other students and picked up. And the second one is 1999. According to his testimony, he and another person put up posters kind of on the anniversary of Tiananmen Square. And they do it in the night. And so far as he's aware, he's not observed. He's then picked up by the police a couple of days later. And I find it hard to be sure that there's a connection between the two. He infers from the sequence that there is. But even according to his own testimony, they don't say, we're picking you up because we saw you do posters. And he doesn't want to volunteer it in case they don't know. So what am I supposed to do with that second 1999 episode? Well, it's reasonable to believe that based on his actions, the first time that he engages in a political activity since the last time he was detained and within a matter of days, he's arrested by the police and interrogated and beaten once again. And based on... No, I'm not sure he's beaten that second time. He says at one point he says hit. But that's about all he says. You're correct. That's an accurate statement. He was punched by police and chained and had food scraps and all that. Handcuffed to the bench for three days. He's very clear on that point. Correct. And so in his mind, it's reasonable to believe that... Before we have you sit down and at least save a moment, I've got one question that bothered me and I'm not quite sure what to do about it. As of course you know, he appeared at his hearing without counsel. He'd previously had counsel. In fact, he'd gone through two lawyers. His second counsel withdraws, Mr. Young, stating as his basis for withdrawal that his client's story was changing and he couldn't represent him anymore. What am I supposed to do with that? The attorney in that case should not have said that to the court. I think I agree with that. And that was error on his part and could have very prejudiced Mr. Song because we don't know exactly what occurred between the It was correct, incorrect for him to do so on record and could have prejudiced the court in that sense. And that should not have been considered. So in your view, that's just something we should disregard? Correct. Okay. You've now saved eight seconds because I've detained you with these questions. Let's hear from the government and we will give both of you a chance to respond. Thank you, sir. Good morning. May it please the Court, Tom Dupree on behalf of the United States. Now, you're not Jamie Dowd. You are correct, Judge Noonan. I am not. How long ago did you get the brief? About a month ago, I think. A month ago. Did you get the record? Yes. Is it there? Is it there, meaning? On the table? Well, I've got a lot of it right here, Your Honor. All right. Good. Because the last one while you were here, they lost the record. And you only had two weeks with the brief. So, for the INS, yes. I did, or in case one of my colleagues did. One of your colleagues. Okay. Earlier this week. Is that right? And we wanted to be sure that you at least had a month to look at the case. Oh, I'm ready to go, Your Honor. And I hope you'll test my knowledge of the record. All right. I will test your knowledge of the brief. I look at this 22-page brief prepared by Jamie Dowd. And it has, if generously construed, two pages devoted to the central question of credibility. Then I look a little further at those two pages, 19 to 21. One of the grounds that the brief relies on are the airport interviews. Now, I think any experienced lawyer for Homeland Security knows that we don't like the airport interviews. They're done hastily. They're not, the immigrant doesn't have counsel. You can't rely on them. But that's the first basis for the, in credibility finding. Speaking for myself, I'll just throw it aside. And then the second one, the second basis is, well, how did he know that, how would the police have known he put up the posters? Now, that's the immigration judge's speculation. How would they have known? Now, it seems to me, at least I know as much about a dictatorship as he does, that in a country like China, the word gets out pretty quickly who did the mischief. And the authorities would not have much difficulty in finding out who put up the posters. The immigration judge was incredulous. How could they have known if he did it in the night? Well, that's ridiculous. In a totalitarian state, of course they would know. Would you agree? I don't know if I, I would agree with that, Judge. All right. But if I might begin with Your Honor's first point, namely, your concern about the airport. I respectfully disagree with Your Honor's statement that the court throws them out. To be sure, the court has said on several occasions. No, I said I'd throw them out. Well. I'm just putting it up front. No, I, well, they occasionally. It varies a little bit with the panel. But basically, they're worthless. But if you can tell me why we should look at them, that's fine. Well, I think this may be one of those cases where Your Honor can make an exception to that, Your Honor's particular rule. Because in this case, there's no dispute that the petitioner lied to INS agents. He admits that. He was asked, are you politically active in China? He said, I wasn't. I think that in a circumstance where the petitioner admits he lies, there's no concern about the reliability or the accuracy of the transcription. There's no concern about the reliability or accuracy of the translation, which are the problems that in other cases have vexed this court. Well, the other main problem, he doesn't have counsel. And he doesn't know what he's getting into. And so the I.J. takes advantage of his ignorance. That's the problem. Well, I respectfully disagree with that, Judge Newton. I think what happened in this case was I think the I.J. reasonably reviewed the airport interview transcripts and did not deny the petition solely on that basis. Rather, what she said, and I think this is an eminently reasonable conclusion, she said, these airport interviews raised concerns on my part, raised concerns about the petitioner's credibility. And in light of those concerns, I'm going to seek corroboration. Again, another reasonable judgment. So she did not deny the petition solely on the basis of the airport interviews. No, it was not. She looked for corroboration, which again I think was reasonable. And I think she reasonably concluded that whereas here the petitioner's sister residing in Los Angeles was available, was in China at the relevant times, and could have spoken to the petitioner. Not times. She was in China in 1989. Correct. She was not in China in 1999. That's correct, Judge Fletcher. She was in China at the relevant time of the 89 incident. But Your Honor's correct, not the 99 incident. And I think that those two holdings, which I think at the end of the day form the basis for the I.J.'s ruling, number one, the airport interviews raised concerns, which I think any reasonable person looking at these interviews would say it's at least a concern. Any reasonable person looking at them would know that he was scared. But I don't... And so he didn't want to get into the kind of things that would have prejudiced him with the people. He didn't know he was going to get assigned or not. He was scared to death. Well, I grant that's a plausible inference. No, that's a reasonable person's view. A prosecutor would look at it the way you do. Well, I think it's certainly a plausible inference. Now, the I.J., let me tell you, is not supposed to be a prosecutor. He's supposed to be a judge. I agree with that. But I don't think she crossed the line in this case. Rather, I think what happened was that she looked at the transcript and she reasonably said this raises concerns. I think that any person who reads this would say at least it raises concerns, particularly in light of the comment that Judge Fletcher made. I wish I wouldn't use the phrase any person. I'm a person. I don't read it the way you do. Well, I think, okay, fair enough. Or any reasonable person. I think I'm reasonable. You might say some people. Some people, certainly. Your point's well taken, Judge Yoon. My point is that although the scenario Your Honor articulated is certainly a reasonable one and a plausible one, this Court's standard, of course, is whether that scenario is compelled by the evidence. And I don't think that anyone, many people who would read these transcripts would say the outcome is compelled, that this person was scared. I think it's certainly a plausible, reasonable conclusion, which is all we need to sustain the I.J.'s ruling, that he wasn't telling the truth and he wasn't credible, particularly when the I.J. then buttressed that conclusion by reasonably requesting corroboration. You know, I've got a different reason that I'm worried about these airport interviews. I don't mean a different in the sense of I don't agree with the others, maybe an additional reason. There is something really screwy about these two airport interviews. I'll just read to you. I'm not sure you need to turn to the pages, but I'm reading from AR-164 and then AR-170. These purport to be the two different interviews. The same question is asked, and then the answer is, okay, the question is your story has changed. I need to know the truth. You're giving a different story to the officer, da-da-da-da-da. I want to remind you you're under oath. Those questions vary a little bit in form, but let me read to you the first couple of sentences of the first answer in AR-164. He responds, I continue to say that the letter is good. I am giving you different information so that you won't get confused. AR-170, supposedly the different answer. I continue to say that the letter is good. I'm giving you different information so you won't get confused. Third sentence, I changed some minor details in my application. For instance, I changed my marital status to married so I could get a visa much easier. Third sentence on the other one, I'm giving you, I'm giving different information so you won't get confused. I've changed some minor details in my application for a visa. For instance, I changed my marital status to married so I could get a visa much easier. This can't be two separate interviews, or at least this answer can't come from two separate interviews. I don't see why not if it's a memorized answer. Well, one of the, because one of them he's speaking in Chinese and it's the translator who's giving it, and the other one it's in English. That's why. Well, again, I think that if he is saying the same thing, even accounting for differences in translation, there are words that change. But we've got three sentences in a row that are word, and mildly complex sentences that are word for word the same. And I'm not quite sure what to make of this except to say that somehow in transcribing this or word processing or rearranging paragraphs, I don't know what to make of it. But there's something screwy about these two interviews. But the petitioner hasn't alleged that there is. I would think that the petitioner has not alleged that there was anything funny about the interviews or the transcription or anything like that. I would think that if this were a case where they were putting down words that he didn't say at some point in the seven years this proceeding has gone on, he would have said wait a minute or one of his many lawyers that's represented him throughout the course of these proceedings would have said wait a minute this simply isn't true. Yeah, I understand that. But what I'm saying is I'm not quite sure what's behind these two interviews that make reference to some earlier possible interview when you told the officer something different earlier. Both of them say you've told the officer something different earlier. There's no we don't know what that reference is to both interviews reference some earlier conversation with an officer which we don't have. I would imagine that that's simply the initial interview with the INS agent right when you get off the plane and you approach the podium and he says let me see your materials that would be the initial contact where they say why are you here in this country and obviously those are not recorded or transcribed. May I ask you the same question I asked the other side what am I supposed to do if anything with Attorney Young's statement as to why he's withdrawing? I don't think you do anything with it Your Honor. Certainly the agency did not rely upon that. The petitioner at no point in the proceedings and even today the petitioner's counsel said we're not alleging that as a basis for error. Don't do anything with it. Ignore it. And I agree 100% with my opposing counsel on that point. Yes. There are no further questions. I see I'm out of time. Okay. Thank you. Thank you very much. Why don't we give you one minute each for rebuttal if you would like to have it. We will be happy to have you. Okay. Great. Thank you. I'd first like to clarify that we do think that the statement made by the attorney was an error. Unfortunately we were unable to raise it because it was waived. It was not brought up by the BIA petition. So I believe as the court was trying to get at that an asylum seeker when an asylum seeker has lied to an immigration official that's normally not a ground that we find it's normally not a proper ground to find an adverse credibility based on an adverse credibility finding on. And the short I guess answer to this all is that Mr. Song did not receive a fair case and he was prejudiced because of it. The immigration judge did not make further inquiry into any alleged confusions and because all of her alleged inconsistencies fail then we ask that this court remand this case so that Mr. Song can receive a fair trial and he can have his voice be heard. So you're not asking us to set aside the adverse credibility finding and hold that he's eligible for asylum here? Oh, I'm sorry. You want us to send it back under Ventura assuming the story is true so that then the IJ can make the decision as to whether or not assuming the story is true? Yes. And with special instructions in particular regarding the initial airport statements, Your Honor. Now, I'm not sure what you're after. You might be asking one of two things. You might be asking us to send it back for further proceedings to further develop the record for determination of credibility or you might be asking us to set aside the adverse credibility finding, assume the story is true, and then send it back for a determination under Ventura on the assumption the story is true, is this persecution that then gives the presumption of a well-founded fear? Which of those two are you asking? I think the latter statement would be correct especially considering case law that states to this principle. Thank you. Thank you very much. Thank both sides for their argument and you do this for a living you're about to do it for a living and you did a very nice job both of you. Thank you. The case of Song is adjourned.
judges: Noonan, Fletcher, Gould